_____

DEBORAH A. FRUMUSA,

Plaintiff                    DECISION AND ORDER

-vs-
                             07-CV-6510 CJS

ZWEIGLE'S, INC.,

Defendant
_____

## APPEARANCES

For Plaintiff:          Jason S. DiPonzio, Esq.
                        Jason S. DiPonzio, PC
                        16 East Main Street, Suite 420
                        Rochester, New York 14614

For Defendant:          Gordon S. Dickens, Esq.
                        Woods Oviatt Gilman LLP
                        700 Crossroads Building
                        Two State Street
                        Rochester, New York 14614

## INTRODUCTION

This is an action in which Deborah Frumusa ("Plaintiff") alleges that her former employer, Zweigle's, Inc. ("Defendant"), discriminated against her, in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the New York Human Rights Law, Executive Law § 296 ("NYHRL"). Now before the Court is Defendant's motion for summary judgment (Docket No. [#10]). For the reasons that follow, the application is granted.

## BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to Plaintiff. At all relevant times, Defendant was a maker of meat

products and operated from a two-story building in Rochester, New York.  The building

housed Defendant's offices and production facilities.  The first floor contained

production operations and two offices.  Both of the first-floor offices pertained to the

production of meat products.  One of those offices was occupied by Defendant's Plant

Manager, Michael Bidzerkowny ("Bidzerkowny"), who was "responsible for running the

production and overseeing the production of the sausages and hot dogs." (Frumusa

Deposition at 33).  The other first-floor office was occupied by Bernice Green ("Green"),

the Cooler Manager, who was responsible for packaging and shipping the meat

products. (Frumusa Deposition at 33-35).

All of Defendant's administrative, accounting and sales functions were performed

on the building's second floor.  Moreover, Defendant's photocopier, fax machine,

postage machine, financial records, and safe were located on the second floor.

Access to the second floor of the building was by two ways: stairs or freight

elevator.  There was no passenger elevator.  Computers and telephones on the first

and second floors were connected by intra-building networks.  Employees were also

able to send documents between the first and second floors using a pneumatic tube

system.

Plaintiff's job title was Accounts Receivable Clerk.  Plaintiff's duties included

photocopying and filing invoices, answering telephone calls, processing mail, handling

checks, and balancing the accounts receivable ledger.  In performing her duties,

Plaintiff was required to use the photocopier, fax machine, postage machine, filing

cabinets, and safe.  Plaintiff was also required to interact with, and occasionally assist,

the sales staff, whose offices were located on the second floor.  (Frumusa Dep. at 55-

63).  Plaintiff also required to make entries in the accounts receivable ledger, which was kept in the company safe, for security and privacy reasons. (Frumusa Dep. at 54-55). The accounts receivable ledger was too large to fit in the pneumatic tube system. *Id*. at 55.

In 2003, Plaintiff had surgery on her ankle and was out of work for several months, during which time  Defendant held her job open for her. (Frumusa Dep. at 84-85).  Plaintiff admits that Defendant accommodated her at that time. *Id*. at 85.

On November 29, 2005, Plaintiff had further surgery on her ankle.  After surgery, Plaintiff was unable to work for several months.  Plaintiff's doctor, Gregory Finkbeiner, M.D. ("Finkbeiner"), cleared Plaintiff to return to work beginning on May 15, 2006, with the following restrictions: 1) that she be allowed to work four-to-six hours per day; 2) that she be allowed to work on the first floor, since she could not climb stairs; and 3) that she be allowed to elevate her leg and use a brace and cane as needed.  Plaintiff's attorney notified Defendant that Plaintiff was prepared to return to work, with the restrictions set by Finkbeiner.

Defendant's controller, Dominic Lippa ("Lippa"), told Plaintiff's attorney that Plaintiff could reduce her hours temporarily, and that she could elevate her leg and use a cane.  With regard to Plaintiff's request to work on the first floor, Lippa suggested that Plaintiff could use the building's freight elevator to reach the second floor.  In that regard, Plaintiff's President, Roberta Camardo, who used a wheelchair, regularly used the freight elevator to reach the second floor. (Camardo Dep. at 126-135).  Moreover, various employees used the freight elevator to avoid using the stairs. (Pl. Counter-Stmt. of Facts ¶ 16(b)). (Frumusa Dep. at 75-80, 146).  Additionally, Plaintiff herself had

previously used the freight elevator for transportation following surgery in or about 1997. In summary, Defendant was initially willing to provide accommodations that would have allowed Plaintiff to return to work.

However, in response to Lippa's suggestion that Plaintiff use the freight elevator, Plaintiff's attorney raised several concerns. For example, the attorney questioned whether the freight elevator was safe for passengers, and indicated that Plaintiff would need assistance operating the elevator. The attorney also questioned whether Plaintiff would be covered by Worker's Compensation insurance if she was injured while using the elevator.

Subsequently, Defendant's Vice President, Julie Steron ("Steron"), contacted Schindler Elevator Company ("Schindler"), which serviced the freight elevator, and spoke to a Schindler representative, John Duryenka ("Duryenka"). Duryenka told Steron that it would violate "state and federal elevator codes" to allow Plaintiff to use the freight elevator if she was not transporting freight. (Steron Aff. [#11] ¶ 28). Duryenka never mentioned any exceptions to such codes that would permit passenger use of a freight elevator. (Pl. Counter-Stmt. of Facts ¶ 24(c)). It is undisputed that, prior to her conversation with Duryenka, Steron was not aware of any legal restrictions concerning passenger use of the freight elevator. (Def. Stmt. of Facts ¶ 25; Pl. Counter-Stmt. of Facts, ¶ 25).

Steron also "became concerned" that Defendant's worker's compensation insurance might not cover an injury to Plaintiff involving the freight elevator. *Id.* at ¶ 30. Steron, though, did not contact Defendant's worker's compensation insurance carrier to check on that issue, nor did she seek a legal opinion regarding her concern. Neither,

apparently, did Plaintiff's attorney check on those issues. (Frumusa Dep. at 75). In any event, because of the foregoing concerns, Steron decided that Plaintiff could not use the freight elevator for transportation.

Plaintiff also questioned the legality of her using the freight elevator, because she knew that the elevator was "for meat and freight only." (Frumusa Dep. At 71). In that regard, she separately inquired whether it was lawful for her to use the freight elevator, and was told by Ken Asmith ("Asmith"), an employee of National Elevator Inspections, that it would violate state and federal elevator codes for her to use the freight elevator for transportation. (Frumusa Dep. at 69-72). Like Duryenka, Asmith never mentioned any exceptions to such codes that would permit passenger use of a freight elevator. Asmith also told Plaintiff that she would not be covered by insurance if she was injured on the elevator. *Id*. at 72-73. As a result of her conversation with Asmith, Plaintiff was "very concerned about using the freight elevator." *Id*. at 73. Specifically, Plaintiff believed that using the elevator would have been illegal and would have left her uninsured in case of an accident:

Q. . . . [Y]ou did not want to use the freight elevator, is that correct?

A. I would have just to come back to work.

Q. But you knew that to do that would require that Zweigle's would violate the law, is that correct?

A. Yes.

Q. And you also knew that if you were injured – at least you believe that you would not be covered if you were injured in the freight elevator, is that correct?

A. Right.

> Q. And in fact . . . you must have advised your attorney that you were concerned about whether you should be allowed to use the freight elevator, is that correct?
>
> A. It wasn't just me [who expressed concern], it was somebody else that he works with who [also] advised him.
>
> Q. Who is someone else?
>
> A. Dennis Phillips, w[ho] worked at the plant before and he said that [the freight elevator] was dangerous.
>
> Q. He said that to who?
>
> A. The attorney [Plaintiff's attorney], Dan Bronk.
>
> Q. So then you raised that concern to Mr. Lippa, is that correct?
>
> A. I didn't, my attorney did.

*Id*. at 73-74. Plaintiff indicates that, apart from using the freight elevator, there was no accommodation that would have allowed her to work on the second floor. (Frumusa Dep. at 151).

Steron also decided that it was not feasible for Plaintiff to work on the first floor for two reasons: First, the only two offices on the first floor were already occupied; and second, Plaintiff's job duties were performed on the second floor. In that regard, Steron states:

> All of Zweigle's administrative functions are located on the second floor of Zweigle's facility. This includes all sales, administration and office work.
>
> Since these functions are completed on the second floor, the equipment necessary to perform this work is also located on the second floor. This includes, but is not limited to, a copier, fax machine, postage machine, safe, customer files and account ledger.
>
> Based on the unavailability of office space on the first floor, as well as the significant limitations to Plaintiff's ability to perform the essential functions of her position without access to the equipment, information and

personnel located on the second floor, Zweigle's believed it was necessary for the Plaintiff to work on the second floor if she was going to return to work.

(Camardo-Steron Affidavit [#11] at ¶ ¶ 20-22).

Steron further decided that it was not feasible to move Plaintiff's work equipment to the first floor and have her share one of the first-floor offices.  In that regard, Steron states:

[The copier, fax machine and postage machine] could not be feasibly relocated given that it is used by all of the other administrative and sales staff, all of whom work from the second floor offices.

In addition, all of Zweigle's customer files are located in fireproof cabinets on the second floor, as is Zweigle's safe.  Again, these items need to be utilized by a number of administrative employees and, therefore, maintaining them on the second floor is necessary.

Further, these items are kept on the second floor for safety issues since this location keeps them out of areas where unauthorized employees and customers could have access to them.

In order for Plaintiff to complete the essential functions of her position from the first floor, she would require substantial assistance, the result of which would be that the individual providing such assistance would be handling the essential functions of the Accounts Receivable Clerk position rather than Plaintiff.

(Camardo-Steron Aff. [#11] at ¶ ¶ 37-40).

Consequently, Defendant notified Plaintiff that it was going to terminate her employment, unless she could use the stairs to reach the second floor.  On May 26, 2006, Defendant terminated Plaintiff's employment.  According to Defendant, Plaintiff's employment was terminated because "[s]he wasn't able to use the freight elevator and she could only work on the first floor.  And there wasn't ability to have her work on the first floor." (Lippa Deposition at 26).

Subsequently, beginning in September 2006, Finkbeiner's office notes indicate that Plaintiff's condition worsened. Specifically, Plaintiff increasingly complained of "nerve related" pain, radiating up her leg and into her lower back. *Id.*, Exhibit A. For example, on September 25, 2006, Finkbeiner stated: "Still with nerve type symptoms radiating from her foot and ankle proximally up the back of her leg towards her back. . . . Will have her try Neurontin . . . She will also see pain management for evaluation and possible nerve blocks. I feel her pain now is nerve related. She may have an element of complex regional pain syndrome or reflex sympathetic dystrophy." *Id.* And on November 17, 2006, Finkbeiner reported: "She reports resultant left lower extremity and low back discomfort. . . . She has chronic ankle and subtalar pain with [range of movement]. In addition her ankle injury can cause resultant leg and even low back discomfort which may require future treatment." *Id.*

On November 16, 2006, approximately five months after Defendant terminated her employment, Plaintiff applied to the Social Security Administration ("SSA") for Social Security Disability Insurance benefits ("SSDI"). For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501. Plaintiff's SSDI application indicated that she was disabled due to "nerve damage in left ankle." (Dickens Aff.[#14], Ex. 9). When asked to describe how such nerve damage limited her ability to work, Plaintiff stated: "Constant pain. Difficulty walking, standing, sitting, carrying, climbing and lifting." *Id.*

Plaintiff's application further indicated that she became unable to work on November 29, 2005, the day of her ankle surgery. (*Id.*; Frumusa Dep. at 131).

On December 1, 2006, shortly after Plaintiff submitted her SSDI application, Finkbeiner provided a report regarding Plaintiff's ability to perform work-related functions. Specifically, Finkbeiner wrote: "Work restrictions: Patient can only work 2 hrs/day and must limit standing to 10 minute intervals, limit sitting to 10 minute intervals, and limit walking to 10 minute intervals. These are permanent restrictions." (Finkbeiner Affidavit [#18], Exhibit A, Progress Note dated November 17, 2006, addendum dated December 1, 2006).[1] Plaintiff admits that with such restrictions, she could not have performed her job duties for Defendant. (Frumusa Dep. at 51).

Finkbeiner, though, maintains that his opinion in December 2006 was "not indicative of whether Ms. Frumusa would have been able to resume her *former position* on a full time basis *earlier* that year." *Id.* at ¶ 10. (Emphasis added). In that regard, Finkbeiner explains:

> Initially, I restricted Ms. Frumusa to a 2 hour workday on December 1, 2006 due to the fact that at that point in time, Ms. Frumusa had been out of work for over a year. Given the length of time that Ms. Frumusa had been out of work, together with learning the requirements and demands of a new job, I felt it would [be] best for her to start working in two (2) hour intervals, with the goal of increasing her workday as tolerated.
>
> Additionally, the two (2) hour work restriction does not take into account Ms. Frumusa's ability to work at her former position as an Accounts

---

[1]Finkbeiner's December 2006 opinion also indicates that Plaintiff was not capable of performing sedentary work, as that term is defined by the Social Security Regulations, since she could only work two hours per day. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Receivable Clerk with accommodations made for Ms. Frumusa's mobility limitations. Ms. Frumusa was already familiar with the demands and requirements of her former position as an Accounts Receivable Clerk. Had Ms. Frumusa's mobility limitations been accommodated, it is my opinion that it would have been a reasonable goal for her to resume full time duties as soon after her return to work date as possible.

*Id*. at ¶ 12.

On January 2, 2007, SSA granted Plaintiff's SSDI application. In that regard, the SSA examiner found that Plaintiff had "muscle, ligament & fascia disorders," and was disabled pursuant to Vocational Rule 201.14. (Dickens Affidavit [#14], Exhibit 10). The examiner's reference to Vocation Rule 201.14 pertains to the Commissioner of Social Security's Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. The grids establish guidelines for determining disability, based on a claimant's age, education level, exertional ability, and transferability of skills. At the time, Plaintiff was fifty-one years old, with education consisting of high school and BOCES courses in bookkeeping and word processing, and years of experience as an accounts receivable clerk and bookkeeper. Based on Plaintiff's age, she was considered a person "approaching advanced age," meaning she was between the ages of fifty and fifty-four. *See*, 20 C.F.R. Pt. 404, Subpart P, Appendix 2. Vocational Rule 201.14 provides that person should be found disabled if they have a maximum sustained work capability limited to sedentary work, are closely approaching advanced age, have a high-school education or more education that does not provide for direct entry into skilled work, and have skilled or semi-skilled skills that are not transferable to other work. The examiner found that Plaintiff was disabled under this rule.[2] SSA's

---

[2]It is unclear why the examiner concluded that Plaintiff's bookkeeping skills were not transferable.

10

application of Rule 201.14 implies that Plaintiff had the residual functional capacity to perform sedentary work on a "regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, POLICY INTERPRETATION RULING TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184 at *2 (S.S.A. Jul. 2, 1996). Moreover, the examiner determined that Plaintiff became disabled on November 29, 2005, the day of her ankle surgery. (Frumusa Dep. at 119). The record does not indicate what medical records, if any, the SSA examiner considered in granting Plaintiff's application.

On October 17, 2007, Plaintiff commenced this action. Plaintiff maintains that she has a disability, and that she requested two reasonable accommodations from Defendant: (1) to be permitted to use the freight elevator to gain access to the second floor; or (2) to be permitted to work on the first floor. Plaintiff contends that Defendant's refusal to provide either accommodation violated her rights under the ADA and NYHRL.

On January 13, 2009, Defendant filed the subject motion [#10] for summary judgment. Defendant contends that Plaintiff cannot establish a prima facie case under the ADA or NYHRL, for several reasons. First, Defendant maintains that Plaintiff was not a "qualified individual," because she was disabled and unable to perform her job with reasonable accommodation. In that regard, Defendant maintains that Plaintiff is judicially estopped from claiming that she could perform her job, since she applied for and was granted SSDI benefits. Second, Defendant asserts that Plaintiff cannot show that she requested a reasonable accommodation. With respect to this contention, Defendant states that it was not reasonable to allow Plaintiff to use the freight elevator,

since it was against the law and exposed Defendant to liability for any injury that might occur. Defendant also maintains that it was not reasonable to allow Plaintiff to work on the first floor, since it would have required eliminating essential functions of her job.

Defendant further contends that even if Plaintiff could demonstrate a prima facie case, Defendant is entitled to the affirmative defense of "undue hardship." As to this point, Defendant maintains that it would have been an undue hardship to make the necessary changes to allow Plaintiff to work from the first floor, since it would have eliminated essential job functions and required purchasing additional equipment, and could have compromised the security of Defendant's financial records.

Plaintiff responds that she was a qualified individual, even though she later qualified for SSDI benefits. In that regard, she relies on Finkbeiner's explanation of his medical opinion, discussed above. Further, Plaintiff contends that using the freight elevator and working from the first floor were both reasonable accommodations. With regard to the freight elevator, Plaintiff maintains that it was a reasonable accommodation, since Defendant's wheelchair-bound President, Mrs. Camardo, continued to use the elevator for transportation, and since the company could have applied for a special permit which would have allowed the elevator to be used for transporting passengers.[3] Plaintiff further contends that allowing her to work on the first floor was a reasonable accommodation, because she would have had access to the networked computer and telephone systems, and since documents could have been transported between floors using the pneumatic tube system. Additionally,

---

[3] Apparently, Plaintiff did not learn that such a special permit could be obtained until some time after she was deposed in this action. (Plaintiff's Dep. at 71-72).

Plaintiff maintains that Defendant could have purchased an additional fax machine and photocopier for the first floor.

ANALYSIS

### *Rule 56*

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,*

477 U.S. at 249.[4]  The parties may only carry their respective burdens by producing

evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts

contained in affidavits, attached exhibits, and depositions, must be viewed in the light

most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences

in favor of the party against whom summary judgment is sought, no reasonable trier of

fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d

Cir.1993).

### *Shifting Burdens Under the McDonnell Douglas Test*

Discrimination claims must be analyzed using the three-tier burden-shifting test

"set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973), and its progeny." *Valentine v.Standard & Poors*, 50 F.Supp.2d 262,

281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d 1327

(2d Cir. 2000); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001),

*cert den.* 534 U.S. 993 (2001).  Under the first tier of the *McDonnell Douglas* test, the

plaintiff must establish a prima facie case.[5]  If the plaintiff establishes a prima facie

case,

the burden shifts to the employer to articulate some legitimate,

---

[4]It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted).  Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)(citations omitted).

[5]It is clear that "the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion as the prima facie stage is *de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis in original, citation and internal quotation marks omitted).

> nondiscriminatory reason for the employee's discharge [or other adverse employment action]. At this stage, the employer need only articulate--but need not prove-- the existence of a nondiscriminatory reason for its decision. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination. In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason . . . is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Valentine*, 50 F.Supp.2d at 281-82 (Citations and internal quotations omitted); *see also,*

*Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003).

At the third tier of the *McDonnell Douglas* test, simply proving that the employer's

proffered reason was false may, or may not, establish the required proof of

discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v.*

*Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2108-09 (2000)). In

this regard, "[t]he relevant factors . . . include the strength of the plaintiff's prima facie

case, the probative value of the proof that the employer's explanation is false, and any

other evidence that supports or undermines the employer's case." *Id*. (internal quotation

marks omitted).

_ADA and NYHRL Claims_

In this case, Plaintiff alleges that Defendant violated the ADA and NYHRL by failing to provide her with a reasonable accommodation.  The ADA and NYHRL "are governed by the same legal standards," therefore, "although [the Court's] discussion will focus on [the ADA, the] decision pertains equally to [the NYHRL] claim." _Rodal v. Anethesia Group of Onondaga, P.C._, 369 F.3d 113, 117 n. 1 (2d Cir. 2004).  The general legal principles applicable to ADA disability discrimination claims are clear:

> A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case. In so-called reasonable-accommodation cases, such as this one, the plaintiff's burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

_Graves v. Finch Pruyn & Co., Inc._, 457 F.3d 181, 183 -184 (2d Cir. 2006) (citation and internal quotations omitted).  Explaining further, the Second Circuit has stated:

> An employer violates the ADA  . . .  when it fails to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can establish that the accommodations would impose an undue hardship.
> ***
> In _Borkowski v. Valley Central School District_, 63 F.3d 131, 137-38 (2d Cir.1995), we laid out a two-step process to evaluate whether the failure to provide a proposed accommodation constitutes a violation of the ADA. First, "the plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions." _Id._ at 138. If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant. _See id_.

_Jackan v. New York State Dept. of Labor_, 205 F.3d 562, 566 (2d Cir. 2000) (citations

and internal quotation marks omitted).  In *Borkowski*, the Second Circuit further stated:

> As to the requirement that an accommodation be reasonable, we have held that the plaintiff bears only a burden of production.  This burden, we have said, is not a heavy one.  It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.[6] Once the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.

> At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship. For in practice meeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing.

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d at 138 (citations omitted).

Regulations interpreting the ADA state that a reasonable accommodation may include "[m]aking existing facilities used by employees readily accessible to and usable by individuals with disabilities," as well as

> [j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

29 C.F.R. § 1630.2(o)(2) (West 2010).  In this regard, the term "reasonable"

> is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well.  We would not, for example, require an employer to make a multi-million dollar modification for the

---

[6]See also, *McBride v. BIC Consumer Prods. Mfg. Co., Inc*., 583 F.3d 92, 97 n. 3 (2d Cir. 2009) ("[W]ith regard to the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits.").

benefit of a single individual with a disability, even if the proposed modification would allow that individual to perform the essential functions of a job that she sought. In spite of its effectiveness, the proposed modification would be unreasonable because of its excessive costs. In short, an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce.

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d at 138 (citations omitted).

It is well settled that "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003). In that regard,

'[e]ssential functions' are defined under EEOC regulations to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.' In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.

*Id*. (citations and internal quotation marks omitted). "[H]aving someone else do part of a job may sometimes mean eliminating the essential functions of the job. But at other times providing an assistant to help with a job may be an accommodation that does not remove an essential function of the job from the disabled employee." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d at 140 -141.

As for "undue hardship," the term is defined by 29 C.F.R. § 1630.2(p), which states as follows:

(1) In general. Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section.

(2) Factors to be considered. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include:

(i) The nature and net cost of the accommodation needed under this part,

taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

As with the concept of reasonableness, the term "undue hardship"

is a relational term; as such, it looks not merely to the costs that the employer is asked to assume, but also to the benefits to others that will result. The burden on the employer, then, is to perform a cost/benefit analysis. In a sense, of course, that is what the plaintiff also had to do to meet her burden of making out a prima facie case that a reasonable accommodation existed. But while the plaintiff could meet her burden of production by identifying an accommodation that facially achieves a rough proportionality between costs and benefits, an employer seeking to meet its burden of persuasion on reasonable accommodation and undue hardship must undertake a more refined analysis. And it must analyze the hardship sought to be imposed through the lens of the factors listed in the regulations, which include consideration of the industry to which the employer belongs as well as the individual characteristics of the particular defendant-employer.

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d at 139 (citation omitted).

<u>*Plaintiff's Prima Facie Case*</u>

Here, Defendant maintains that Plaintiff cannot demonstrate a prima facie case,

for two reasons. First, Defendant argues that Plaintiff cannot demonstrate that she was

otherwise qualified to perform her job with an accommodation, because she was completely disabled from working. Second, Defendant contends that Plaintiff has not identified a reasonable accommodation.

At the outset, Defendant asserts that Plaintiff should be judicially estopped from claiming that she could perform her job functions with an accommodation, because she was found to be completely disabled by the SSA. As to this position,

> [t]he doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding. *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999). Thus, "[a] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." *Id*. (citation omitted).

*Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d at 118. In cases involving the ADA,

> [t]he law in this circuit recognizes that when an individual's prior submission regarding his disability to an adjudicatory body contains a "purely factual statement[ ] that directly contradict[s]" a statement made in a subsequent ADA claim, and the two "[can]not be reconciled with any amount of explanation," judicial estoppel will preclude the ADA claim. *Parker v. Columbia Pictures Indus.*, 204 F.3d [326,] 334 [(2d Cir. 2000)] (citing as examples of factually contradictory statements plaintiffs' assertions that they could/could not raise their arms above their head, or could/could not stand and walk). As the Supreme Court cautioned in *Cleveland v. Policy Management Systems Corp*., 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), however, a court must carefully consider the contexts in which apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction. In *Cleveland*, the Court ruled that a representation of complete disability in a Social Security proceeding was not directly contradicted by the same person's ADA claim that he could perform essential job functions with reasonable accommodation because the former proceeding did not consider the effect that reasonable workplace accommodations would have on the claimant's ability to work. *See id*. at 807, 119 S.Ct. 1597.

*Id.*  In this case, viewing the evidence in the light most-favorable to Plaintiff, her claim of disability in her SSDI proceeding and her statements in this action do not present an irreconcilable direct conflict.  Consequently, Defendant's summary judgment motion on such ground is denied.

Defendant further maintains that Plaintiff has not met her prima facie duty of identifying a reasonable accommodation, since using the freight elevator was illegal and unsafe, and since Plaintiff could not perform her essential job duties from the first floor. As discussed earlier, "with regard to the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits." *McBride v. BIC Consumer Prods. Mfg. Co., Inc*., 583 F.3d 92, 97 n. 3 (2d Cir. 2009).

Beginning with the freight elevator, the Court finds that Plaintiff has not made a prima facie showing that using the freight elevator was a reasonable accommodation.  It is undisputed that Defendant offered the elevator as an accommodation, and then rescinded the offer after Plaintiff raised concerns about safety and insurance.  Plaintiff cannot claim that Defendant's decision in that regard violated the ADA, because she essentially rejected the proposed accommodation.

A different situation might exist if Defendant had merely represented to Plaintiff that the freight elevator was not an available accommodation, based on an unreasonably inadequate investigation into the matter. *See, McBride v. BIC Consumer Prods. Mfg. Co., Inc*., 583 F.3d 92, 100-101 (2d Cir. 2009) (Noting that an employer may be liable under the ADA for failing to engage in the interactive process where the

plaintiff can show that an accommodation existed).  In this case, however, at the relevant time, both Plaintiff and Defendant agreed that the freight elevator was not a feasible accommodation.  Therefore, it would not be equitable to now allow Plaintiff to claim that Defendant failed to sufficiently engage in the interactive process in that regard. *See, New York Cen. Mut. Fire Ins. Co. v. Edwards*,  No. 07-1267-bk, 2009 WL 230146 at *1 (2d Cir. Jan. 30, 2009) ("The doctrine of equitable estoppel precludes a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted.") (citations and internal quotation marks omitted).

Plaintiff now argues that Defendant could have obtained a permit to allow passenger use of the elevator.  Alternatively, Plaintiff contends that the freight elevator was a feasible accommodation because Mrs. Camardo used the elevator for transportation.  The fact, though, that Plaintiff subsequently discovered that a permit might have been obtained to allow her to use the elevator, or the fact that Mrs. Camardo used the elevator for transportation,[7] are really irrelevant, since Plaintiff believed, at the relevant time, that using the elevator was neither legal nor safe.  Although Plaintiff now faults Defendant for failing to discover that a permit might have been obtained, the fact is that Plaintiff, who was represented by counsel at the time, made her own investigation into the matter and reached the same conclusion as Defendant, namely, that it was illegal, and possibly unsafe, to use the freight elevator to

_____

[7]Plaintiff was well aware that *some employees* used the freight elevator for transportation.  However, the point is that *she* did not want to use the elevator, because she believed that it was not legal or safe to do so.

22

transport passengers.  Consequently, Defendant's summary judgment motion is granted as to that portion of Plaintiff's claims that is based on the freight elevator.

As for Plaintiff's alternative request to be allowed to work on the first floor, Defendant maintains that such accommodation was not reasonable, and that Plaintiff therefore cannot establish a prima facie case.  In that regard, Defendant contends that the proposed accommodation was not reasonable because it would have required the elimination of certain essential job functions.  However, the Court disagrees, because the proposed accommodation on its face would not necessarily have prevented plaintiff from performing any of her essential job functions.  Plaintiff claims to have been physically capable of performing all of her job duties, such as filing, copying, using the computer, and talking on the telephone, and the costs of accommodating Plaintiff do not, on their face, obviously exceed the benefits.  Therefore, Plaintiff has met her light burden of identifying a reasonable accommodation.  Defendant's motion for summary judgment is therefore denied to the extent that it claims that Plaintiff cannot demonstrate a prima facie case.

### _Defendant's Affirmative Defense_

Defendant maintains that it was not logistically or economically feasible to make the necessary changes that would have permitted Plaintiff to work from an office on the first floor.  As discussed above, once Plaintiff establishes her prima facie case, "defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." _Borkowski v. Valley Cent. Sch. Dist._, 63 F.3d at 138 (citations

omitted).  To prevail on this affirmative defense at the summary judgment stage, the Court would have to find as a matter of law that the proposed accommodation would impose an undue hardship on Defendant.

Defendant essentially contends that moving Plaintiff's work station to the first floor would have imposed an undue hardship, for the following reasons: 1) there was no available office space on the first floor; 2) the equipment necessary for Plaintiff to perform her job, including the copier, fax machine, postage machine, safe, filing cabinets, and ledger books, were located on the second floor; 3) plaintiff would not be able to file documents in the filing cabinets; 4) the first floor was not a secure location for Plaintiff to handle customer payments or make ledger entries, and she also would not have access to the safe; 5) Plaintiff would not have direct access to the mail to process payments, since mail was sent directly to the second floor; 6) it would be more difficult for Plaintiff to meet with sales staff because they worked on the second floor; and 7) it would be difficult for Plaintiff to provide telephone coverage when other administrative staff were busy or absent.

In response, Plaintiff addresses some, but not all, of these concerns.  Because Plaintiff's argument on this point is brief, the Court will include it in its entirety:

> In the alternative [to using the freight elevator], Ms. Frumusa requested a first floor workstation in order to perform her job as accounts receivable clerk.  The record indicates that there were two (2) first floor office spaces available, with the offices being approximately 12 feet by 6 feet and 12 feet by 12 feet respectively.  These spaces would have been large enough to accommodate a desk, computer terminal and telephone, all instrumentalities used frequently by Ms. Frumusa in her position as accounts receivable clerk.
>
> Additionally, the computers at Defendant's facility were networked, and Ms. Frumusa would have had access to the computer software and

electronic documents necessary for her job. The telephone would have permitted Ms. Frumusa to contact Defendant's customers, and if other staff required assistance in answering telephones, Ms. Frumusa could have done this from her first floor workstation.

There is also a pneumatic tube system present at Defendant's facility, which would permit the transmittal of documents between the second floor administrative offices and Ms. Frumusa's first floor workspace. Defendant has claimed that Ms. Frumusa needed to be in close proximity to the fax machine or the photocopier from the second floor, however Defendant has presented no evidence that the purchase of an additional fax machine or a small photocopier would have presented any sort of financial hardship upon them.

Accordingly, a first floor workspace would have also permitted Ms. Frumusa to complete the essential functions of her position at little or no cost to Defendant. Accordingly, questions of fact exist with respect to whether a first floor workspace would have been a reasonable accommodation, requiring denial of Defendant's motion for summary judgment.

(Plaintiff's Memo of Law at 13-14).

It appears that Plaintiff could have used the telephone, computer, and tube system to perform certain aspects of her job. For example, from the first floor, Plaintiff presumably could have answered incoming telephone calls, communicated with other staff members, had access to certain financial information contained on the computer system, and sent certain documents back and forth. Moreover, the Court agrees that Defendant has not submitted any detailed financial information regarding the cost of purchasing an additional copier or fax machine.

However, Plaintiff has failed to demonstrate the existence of triable issues of fact with regard to the remaining aspects of Defendant's "undue burden" defense. For example, it is undisputed that it was part of Plaintiff's job to manually file documents in the filing cabinets maintained on the second floor, and she has not explained how she

could perform that aspect of her job from the first floor.  Similarly, Plaintiff has not

explained how she could perform those aspects of her job that required her to have

access to the safe and ledger books, which were located on the second floor.  Notably,

the record indicates that the ledger book was too large to fit in the tube system.

Further, Plaintiff has not refuted Defendant's contention that the first floor was not a

secure location to handle checks and financial records due to the presence of

customers and non-administrative employees.

To summarize, Defendant has provided evidence that it would impose an undue

hardship to have Plaintiff work from a first floor office, because she would not have

access to the company's filing cabinets, ledger books or safe, and because the first

floor is not a secure location to handle money and financial records.  Plaintiff has not

offered any evidence to rebut Defendant's evidence on these points.

In terms of the *McDonnell Douglas* analysis, Plaintiff and Defendant have met

their respective burdens at the first and second stages of the analysis, and the burden

has shifted back to Plaintiff to create a genuine issue of material fact as to whether

Defendant's proffered reasons are false and as to whether Defendant had a

discriminatory reason for terminating Plaintiff's employment.  Plaintiff has submitted

evidence challenging some of Defendant's arguments in support of undue burden, but

not others.  On the entire record, the Court finds that Plaintiff has not carried her burden

at the third step of the *McDonnell Douglas* analysis.  In making that determination, the

Court has considered all of the relevant factors discussed above, including the

complete lack of any evidence that Defendant was actually motivated by discriminatory

animus.  The Court notes that Defendant's President was herself disabled, and that

Defendant had previously accommodated Plaintiff following surgery.[8]  Moreover, it is undisputed that Defendant was willing to accommodate Plaintiff following her most-recent surgery, until valid concerns were raised by Plaintiff concerning the legality of using the freight elevator for transportation.  Significantly, Defendant's willingness to accommodate Plaintiff went beyond providing access to the second floor, and included reducing her work hours.  The fact that Plaintiff may have been able to perform some aspects of her job from the first floor does not create a genuine issue of fact as to whether Defendant's undue burden explanation was false or as to whether Defendant had a discriminatory reason for its action.  Consequently, Defendant is entitled to summary judgment. *See, Trotter v. Gates*, No. 06-56864, 288 Fed.Appx. 398, 399, 2008 WL 2951350 at *1 (9th Cir. Aug. 1, 2008) ("The district court properly granted summary judgment on Trotter's discrimination claims because he failed to rebut defendant's evidence that the requested accommodation would be an undue hardship to the defendant."), *cert den*., 130 S.Ct. 514, 78 USLW 3252 (2009); *Reeves v. Sanderson Plumbing Prods., Inc*.  530 U.S. at 149, 120 S.Ct. at 2109 ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was

---

[8]*See*, Plaintiff's Deposition at 84-85 (Plaintiff testified that Defendant accommodated her disability following ankle surgery in 2003).

abundant and uncontroverted independent evidence that no discrimination had

occurred.")

CONCLUSION

Defendant's motion for summary judgment [#10] is granted and this action is

dismissed.

SO ORDERED.

Dated: Rochester, New York
     January 13, 2010

                                ENTER:


                              /s/ Charles J. Siragusa_____
                              CHARLES J. SIRAGUSA
                              United States District Judge